Thank you very much, Your Honor. Counsel to the government, may it please the Court, I'm Rob Stephens from Billings, Montana, representing Ryan Zimmerman and the Small Family Health Business Corporation, ASSI. I think for purposes of my oral argument to you this morning, I'm going to make certain assumptions. First of all, that Ryan properly preserved the sentencing issues, both originally on appeal and on remand. Secondly, I think I'm going to assume that the scope of the remand on the resentencing after the original appeal was not a limited scope. And I think those are fair assumptions under the record that's been made in this case and do not need to be addressed again. So what I want to do is address the fundamental issues in connection with the sentencing aspects of Ryan's case. As you know, this circuit released him pending appeal, and he served five months at a federal correctional institution and is now at home with his family and working. The circumstances of the offense, just to briefly refresh your recollection, was that he had an asphalt contract with VIA to do some road work. VIA canceled it, and they suggested that he submit a stockpile payment. They didn't know what it was. They told him. So he put together a list of truck trips and trucking invoices that was comparable to the amount of asphalt that would have had to have been trucked to the site in the Dakotas. That wasn't adequate. They called him and said, we don't know what the cost of your asphalt is. So he took the original early spring bid from Axon Refinery and then altered it to reflect the late summer price, which was significantly higher. And he was convicted of submitting false statements. And that totaled $165,000 approximately? Yes. The original invoice or claim that he submitted was $176,000. The agency reduced it to $263,000. And paid him? And paid him. So they were out $165,000? Approximately, Your Honor. So that's their loss, isn't it? No, it isn't. Because the standard is, for purposes of restitution and determining loss, although they're not necessarily the same, but in this case I submit they are, is what would have happened but for the fraudulent act and how would the transaction have been handled if Ryan had submitted the proper invoices? In other words, the standard is to compare what the fraudulent result was and then to compare the result if Ryan had acted lawfully. Now, when we address this, we have to remember that there was no stockpile contract. It was a supply contract. It's a little bit different. When the government terminated that contract for the convenience of the government, ASSI and Ryan were entitled to receive certain termination of contract benefits. That's the law. Also, they had asphalt. That was what the government contracted for. Well, it's my impression from the record, never mind the law, that they received $163,752 without any indication. Without any what? Indication in the record of offsets, credits, overhead expenses, anticipated profit, or anything. Well, these were prepared and offered, Your Honor, but Judge Shandstrom declined to accept them. That was an offer of proof made at resentencing. We had attempted to introduce that at the original trial when we offered the instruction to the jury to find actual loss to the government. That's an instruction. I'm talking about facts, not legal theory. No, no. These are facts. We had cross-examination regarding overhead expenses and materials like that. Because Ryan did not testify, we did not put on a defense at the first trial. At the sentencing, however, Your Honor, we had available Ryan's father, Robert Zimmerman, who testified about average profit based upon the contract amount. We also had actual physical evidence of calculations of overhead prepared by the corporate accountant. And when we went back for resentencing, we had the corporate accountant there. We had the attachments as exhibits that were offered in connection with our offer of proof. Well, you see, the difficulty to me is perhaps you shouldn't assume a remand with everything on the table, because you had a sentencing proceeding and appealed and there was no sentencing issues raised. On the appeal? On the original appeal. No, Your Honor, that's not what I'm talking about. Until supplemental briefing raised the Sixth Amendment issues. So we do not vacate the sentence or reverse the sentence. We leave the sentence in place and remand for the district court to consider Blakely, Omeline, and when they came down, Booker, and Fanfan, from which I deduce that the purpose of the remand, albeit not an Omeline II remand because it hadn't come down yet, but it was the same kind of animal. In other words, we left the sentence in place and sent it back for the district court to consider intervening authority and see whether the sentence is reasonable. And that's the question we've got now. Was the sentence reasonable? No, I disagree, Your Honor. I don't – I think that that is not an accurate reflection of how the remand occurred because at the oral argument and in the supplemental briefing in this case, it was conceded by the government that we had raised proper issues on the sentencing and that – On Sixth Amendment grounds. But also – I don't understand that. That wasn't the – that was not the limitation because we had also raised these other issues, including the enhancement, improper enhancement, I believe, and the right of offset and the right of restitution. Now, the language of the remand is vacating and finding as a matter of law that no reasonable jury could have found Ryan guilty on one count, and then it was remanded for resentencing. Now, the resentencing, yes, it referred to Ameline, it referred to Booker and Fanfan. It actually didn't remand for resentencing. It remanded to – for the district court to consider those cases. It's my understanding that the other public's opinion contained that language, that the district court was to resentence in light of the – Where does it say that? That would be the – pardon me, Your Honor. I did not think that this would be an issue. And I'm looking in the appendix. Interesting. I don't have that on mine. I don't have that on mine. The red brief appendix. I'm sorry? The red brief appendix 2. Yes. Page 4. The sentence was left in place, right? And we instructed the district court to consider the Sixth Amendment cases. It was my understanding, Your Honor, that the language of the remand did not contain language of limitation, and that the rule in this circuit is when there is a remand with instructions to – for the district court to consider in light of other cases, that that is not a restrictive remand. And, in fact, the resentencing issues that had been preserved earlier should be addressed under Rule 32 and within the scope of the remand. In other words, you do not waive sentencing error when you're returned for resentencing. And I think there's language in this circuit that says that. But our review now is for reasonableness, right? No. I think that we are looking for, first of all, whether or not there was an error of law, and that's a review de novo. And, secondly, I think that we are looking at whether or not the court restitution order was legal. Now, I don't think that that is a reasonableness inquiry. I think it goes beyond reasonableness. What's illegal about the restitution? It's a reasonableness inquiry, Judge. The government argues that if there was an error in the enhancement, for example, that the two-point enhancement that was imposed for more than minimal planning or concealment, which I do not believe were borne out by the facts, then it would make just a nominal difference. Also, the government takes a look at our original objections and our calculation and deduction of lost profits from the stockpile payment and says, well, that would only make a one-point difference in the sentence. But that's not the point, Judge. The point is that when you determine a sentence, then under the mandatory guidelines, now under the advisory guidelines, the district judge is duty-bound to address the legitimate claims of the defendant that, A, I have property to return to the government and I should get credit for it. B, if I had acted lawfully, I would have received an overpayment, but not the entire amount of the payment. The government is not entitled to a windfall. The government is not entitled to present itself as a contractor, then say we're not going to use it, and then reject the materials. That's not fair. I'm having trouble with your, with the factual scenario that you make the assertion that you were going to return some property to the government. Now, I have the impression, first of all, that these invoices, all of them, or the bulk of them, were all fraudulent. That's where the underlying conviction arises. And then in the course of events, your client also represented to the government that some of this material had spoiled in a way that he had to dispose of it. And that turned out to be, according to this record, false also. That was the father, yes. And then later on, you're saying, well, now we have all this material stockpiled, and the government should take it. Now, at the time you were making the invoices, or your client was making the invoices, and at the time that he was writing the letter saying it all had to be disposed of, and that was costing great sums of money, in truth, there was nothing there. And anything that you're trying to tender to the government either came into his possession or came into being long after this crime was committed. Am I wrong? You are wrong. Okay. And here's why, Judge. At the conclusion of that contract season, there is leftover asphalt. And the asphalt is held in storage tanks. There are two small asphalt businesses, one in Dakota and one in rural Montana. And there is that residual, and it has cutter fuel. The representation on the loss of the asphalt was a reference to a letter that was written, never sent, and it was not a defensive time of trial. And it was a mistake. There had been sludge taken out the year before, and that was documented through the North Dakota Environmental Quality State counterpart. But that was a year before. After this contract, the Zimmermans, father and son, contacted the BIA in 2001 and 2002 saying, We still have asphalt. Remember, this is a stockpile request. So they have to have material. Now, the seasonal nature of asphalt says you buy it at a better price in the spring, you buy it for your future summer needs, and you try and get rid of it all by the end of the fall. They were transacting business in 2001, 2002, but the material is there. Well, hasn't that been resolved? Isn't, in fact, it the case that the material was never there? Isn't that? That is, at the time, at the time of this request for $160,000 or $170,000. I know it's true. There was no, no, no stockpile, quote, someplace that somebody could go and look at. And that was the remarkable thing about the entire transaction, because an asphalt supply contract does not lend itself to the concept of stockpiling, because you do not stockpile asphalt. You stockpile gravel or other permanent materials. That's why the stockpile request is such an anomalous thing here, because it isn't. What is it, a fiction as far as physically? Physically, it's a fiction. There is no, quote, stockpile in the sense that we think of a pile of something. And never was, and everybody knew that. But that was rejected as a defense by the jury, because Ryan took a bunch of trucking invoices, typed up a list, and stuck those invoices that had nothing to do with the performance, and then falsified the contract. Now, that's ostensibly what the government is paying you for, is for the expense of assembling all this stuff that was never assembled.  They were bought and paid for, and they were assembled. And none of that is true. That's why the jury found it guilty. No. Found your client guilty. Now. No, that's not true, Judge. Wait a minute. Now, you're saying at some later date, the government should accept a tender, a tender of some material, right? Yes, I am. That never existed until well after this conviction. Let me explain just very briefly the nature of this little asphalt company and how it works. It is a seasonal purchase. At the time that the stockpile request was submitted. Late in the season. Late in the season. The reserves were drawn down. Most of the asphalt was probably not there, but certainly after the receipt of the payment, it would have been pretty well used up. But the contractor recognized, and as did the government, or should the government, should have, is that you don't hold asphalt in your tanks over the season. It's too costly, too expensive out there. You've got to keep it hot to use it. So you draw it down as far as you can. In the beginning of the next season, you draw it up. It does not make a difference that the original asphalt was used and drawn down, because asphalt is not subject to stockpiling. But the replacement of the asphalt in the next season and the offering of it and the request for the stockpile did not initiate with the contractor. It came from the government contracting officers. The offer was made way after, A, the crime, and, B, the charges. Yes? It was the next summer. It was made after the crime and after the charges. No. You mean there was an offer to the government to take the stockpile before the indictment, before the charges were made? There was an inquiry, and that was established in the record at the trial level by the BIA contracting officers. You know the chronology. I mean, it's either yes or no. The answer is? Was it made before the crime and after the crime, before the charges? Yes. There was an offer by the contractor making inquiry of the BIA when they would be wanting to accept delivery. The BIA said, no, we don't need it. That happened in two successive years before the indictment. Now, the letter that you had referred to as being an indication of fraudulent misrepresentation came in the third season when the Zimmermans were suggesting as part of that letter that they wanted to perform. Now, that was a letter that was never sent, and it did have false statements in it. There's no question about it. But that was consistent with their course of conduct for the two succeeding years. In any event, I'm way just about out of time. You may wish to save some time. Yes. In summary, a contractor who submits a simple basic, and this was a simple basic fraudulent claim, is entitled to the benefits of an agreement as if he had acted lawfully under the standards. Under Rule 32, the district court judge did not address these issues. They were well preserved. And on remand, I would request that the court direct the judge to address these issues. Thank you. Okay. Thank you, Mr. Stevens. Mr. Johnson. Good morning to the panel, counsel, and may it please the Court. Your Honor, I would like to address some of the factual issues, and I hope I can through the course of this argument. But I want to first address what I think is the overlying issue here that really avoids all of these factual problems, and that is whether or not the scope of the remand in this case was limited to the Sixth Amendment issue. And where do we go from here? Mr. Johnson, may I ask you a question? It seems to me, no matter what the technical scope of the remand was or maybe should be or whatever, it's all kind of, in effect, mooted out and is a red herring at this point, because the district judge obviously interpreted it as a resentencing, although he sort of limited it in part. But he took it as a resentencing. And at this point, don't we review in any event to see whether the sentence was reasonable? I mean, isn't that our real task at the moment? In any event, Your Honor, if we are not going back to recalculate the guideline range, then under Ameline 2, you are correct. What we need to do is review the sentence for reasonableness. And along those lines, Your Honor, if we accept the court's release. But this guideline sentencing calculation has never been reviewed. I mean, it wasn't reviewed by us before, as we frequently do now in omniline remands. We dispose of the accuracy of the guidelines calculations. But we didn't do that here. We just sent the whole rascal back for resentencing, didn't we? Well, you're correct, Your Honor. What was done was, as Mr. Stevens pointed out, was the court sent it back for sentencing in light of Blakely, Ameline, and then later Booker. The court, upon resentencing, said, I think the scope of the remand is narrow enough that I'm simply going to advise the appellate court that I'm going to do the same thing under the now advisory guidelines, which is what he did. And the district court did not make specific guideline findings at that point. Obviously, our position on papers here is the court issued a guideline sentence, a low end of the guideline sentence. Well, if I can just interrupt a second before we go beyond the remand. Now, when this gentleman was originally sentenced, he was sentenced upon having been convicted of three felonies. When he was resentenced, he was sentenced on the basis of two felonies, and neither of those felonies were the crime of making a false claim. Right? The false claim was reversed, and he was sentenced then on two counts of making false representations. Now, how does the district court deal with a sentence when on one occasion it's sentencing him on three felonies, on the second occasion it's sentencing him for two felonies, without taking a look at the whole situation as it exists on the day of the resentencing? And just to compound my question a little more even, supposing he had come up with $160-some-thousand and said, here it is. Here it is, government. You're paid in full. I'm sure the court would have sentenced him differently based upon the condition as it exists on the day he's sentencing the man and on the fact that he's sentencing him for two felonies instead of three. Now, why isn't this a wide-open look at everything on that second occasion, including all of the new law? Here's my take on where Booker leads us, Your Honor. Booker instructs the district courts to construct a guideline range, albeit an advisory one, and to consult with that range, and then to issue a sentence finally within some form of reasonable range, which is based upon the findings in 3553A, as we've all been through this many times. Clearly, the guideline calculation was at issue in the first sentence, and that Despite the fact that count one was removed. In fact, it came up in the first appeal. If count one is no longer in the mix here, does that change the guideline calculation? And the answer to that question to the first panel in this case was no, it does not. The court originally issued three consecutive sentences at the low end of the guideline range. I mean, three concurrent sentences. That is, if you remove one of them, the court still had to look at the entire sentencing picture in order to come up with an advisory guideline range. So that upon resentencing, the court said, look, even though count one is gone, it doesn't change anything. And clearly, our teachings from Booker are that the court has to consider all of the real offense conduct in constructing that advisory guideline range. And so it didn't change that calculus from the first sentencing to the second sentencing. But it's still up for grabs for us to look at, isn't it, in the context of the resentencing? Isn't it? Well, in the context of the resentencing, the court issued a low-end guideline sentence. Well, yeah, but so what? That we have asked the court to consider that a reasonable sentence as it inherently incorporates the purposes of sentencing that are instructed in Section 3553A. Well, if there is no presumption of reasonableness, as our law yet has yet to say there is, then what is your argument? In the absence of no presumption of reasonableness, Your Honor, our argument would simply be that the sentence itself did incorporate the necessary purposes, the reasonable purposes of sentencing found in Section 3553A. Even if we don't give it a presumption, which we think it very clearly should be accorded in this case, the court issued a sentence at the low end of the guideline range that incorporated the purpose of deterring future conduct. It incorporated the seriousness of the crime because of the level of loss that the court had earlier found. By incorporating these notions, the guideline sentence itself was an expression of what the Sentencing Commission had stated as reasonable under like circumstances. Now, I know the court doesn't probably feel comfortable extending a blanket per sentence is always reasonable, but in the garden variety case, such as this one, we feel that there are no exceptional circumstances to consider that would take it out of that reasonable range. And so when the court reasoned... Can I just interject? You said the loss determination that the court had earlier made. Now, at least what I'm taking from counsel's argument is that they presented a notion that the loss was overstated, as found by the judge, that there were legitimate claims for reimbursement from the government for activities, materials, whatever, that they had incurred that were fundamentally legal and that the BIA overpaid by whatever percentage was attributable to fraudulent manipulation of You may disagree with that, but let's assume that were the fact, that the BIA was obligated to pay Zimmermans some money for what they had. And let's just say they were obligated to pay them $50,000, and the fraudulent component was the balance, okay? So the district judge didn't properly recognize that and therefore calculated the guideline range, the enhancements and whatever, on a full $165,000 when it should have been $50,000 less. Are we, A, able to review that now and weigh that in the reasonableness calculation? I think we can, Your Honor. And I think what we need to do is look at the first sentencing. And at the first sentencing, Your Honor, what the defendant did was he said, as you've described, we deserve some accounting for lost profit and so forth. And, in fact, he represented to the judge at sentencing that the guideline range should be one level less, that it should be calculated at a base of 6 plus 6. And then he also objected to more than minimal planning at that time. If we assume that the court had accepted the defendant's representations at the first sentencing, he would have been given a guideline range, and we also have to assume that the court properly applied more than minimal planning, which I think is not a close question. But if we assume that the court had accepted the defendant's representations as to that one point at the first sentencing, then the court did sentence within that applicable guideline range because the 18-month sentence was at the low end of the range, the upper range, which the court found based on $163,000, and it was at the middle of the range that the defendant was, at that time, advocating at least on the basis of his loss argument. So I think what the court should look here at is not the second sentencing so much as what was resolved in the first sentencing. And that was clearly the defendant's position in that case. You can look at the transcript, and it's in there. The other issue is, well, did the court err in not granting or in applying the more than minimal planning enhancement, and the defense has attacked that issue as well. And our position on that is very clearly that the factual record in this case contained proof beyond a reasonable doubt from the facts of conviction that more than minimal planning was an issue here and that the court properly applied that enhancement and had no obligation to resolve any factual disputes therein because they weren't material to the application of that enhancement. I hope that answers your question, Your Honor. Mr. Johnson, may I add a question? May I ask you further to the same question or same argument? In the second sentencing, was there any proffer or evidence different from that presented in the first sentencing that led to that guideline calculation? There was. As we've noted in our brief, Your Honor, the defendants revised now what he wanted deducted from the $163,000. And the court declined to entertain those objections, but the district court did take into evidence several pieces of information submitted by the defense. And those are attached to, I believe it's Appendix 5 in our brief. They're the last two pages, and there's some handwritten pages there. And what those documents purported to establish was that the defendant was due almost $80,000 per year for the heating and storage of this product. And it was very clearly shown at trial, and as we've cited in our brief to the testimony, that the product was never mixed and it was never stored, and thus there were no overhead costs. And the pre-sentence report made that finding. In the initial pre-sentence report in this case, the probation officer who had been fully advised of the evidence in this case concluded, as no doubt the judge did after listening to all the evidence, the stuff was never mixed and it was never stored. So how could there be an offset to account for the ongoing costs of storage and heating and keeping this material for a later pickup by the Bureau of Indian Affairs? It simply did not happen. And so we believe that if we look at the original sentencing record in this case, the court was absolutely well within its discretion in applying the more than minimal planning enhancement based upon the facts of the elements of conviction in this case. Does that address your question, Your Honor? Well, yeah, I guess it does in a way. But let me ask then a follow-up to the follow-up, and that is the district court in the second sentencing declined to consider some material or declined to consider the argument that offsets should be recognized. Why isn't that erroneous or a problem? Well, because it was rehashing of the same original arguments, Your Honor. It wasn't new material? It wasn't new material? Your Honor, you're correct. What they did was they embellished the original arguments. They originally made the statement to the court that they were due some offsets, and they proposed a figure. By the time it came around to the second sentencing, their numbers had improved considerably so that they were arguing to the court that there should be no loss whatsoever based upon their profit expectations and the costs that they had incurred. But the response to those arguments would be and is the same in the second sentencing as it was in the first. If you don't mix the material and you don't store it, then there are no costs associated with it that can be accounted for in a, quote, stockpile payment. And that is the essence of the fraud in this case, and it is also the essence of the calculation of loss. If the defendants had material on hand that they sold to other parties, then very clearly they did not have costs associated with holding product for the Bureau of Indian Affairs, and that's what the entire stockpile claim was predicated upon. And I guess my final point here, Your Honor, is I think we need to consider, obviously, as we have, where that leaves us. Our position is that the court went through the process of calculating a guideline range in the first instance, and in the second instance it resolved the Sixth Amendment violation issues. The record is complete as to the guideline calculation, and the court sentenced within that guideline range, and in fact at the low end of that range. And we believe that this court should adopt a presumption that that sentence was reasonable because it fell within the properly calculated guideline range at the first sentencing, which was never appealed by the defense. And with that, Your Honor, I will conclude unless the panel has more questions. Well, now I take it at the second sentencing, the defendant was in effect tendering to the government some material in a stockpile. Do I have it right? You do, Your Honor. At the time that this was working through the criminal sentencing process, the defendant and the government had been engaged in some civil litigation on a separate issue, and also in this case there was a false claims case filed. Yes, Your Honor. As part of the reference. I'm sorry. Well, and theoretically, if that tender of material was worth anything, the government could have accepted it and either sold it or used it, right? Theoretically. Theoretically, Your Honor, if that contract was still open and if they were still repairing that road, yeah, they could have used it. The problem was that years had passed and everyone had moved on. I understand. In fact, that road had been. But it still had a value. If it existed in a stockpile, it had a value. Well, yeah, it had a value. Now, all I'm getting at is that if a defendant is willing to do that, should that make any difference in the court's mind in its now nonbinding guideline approach to sentencing, wherein it has some discretion. And here it has a defendant in front of it that is trying to tender to the government some wealth that the government doesn't want or won't accept. Should that make any difference in the judge's attitude toward the defendant? Because in this case, the court rejected that evidence entirely, did it not? It didn't even go beyond an offer of proof. I think, Your Honor, it's fair to say that that issue had probably been raised in the first sentencing. But I think that this is a very dangerous issue for us to consider in the context of a fraud case. Because what we're talking about is any defendant in a fraud case, after he's caught and convicted, is going to offer to pay the victims back for what he stole in order to escape liability under some reasonableness standard that isn't somehow incorporated in the guideline. And clearly, that's a victim. I'm not talking a minute, for the moment, about how it would measure up under the guideline. I'm talking about the difference between a defendant who makes no effort to rectify the financial wrong that he has committed as opposed to one who does. Doesn't that make a difference to the sentencing judge, or should it? I think it should before the crime is complete. I think after conviction and judgment, as in this case, it should not matter. We've cited several cases in our brief, United States v. Stoddard and United States v. Bright. Now, do you understand I'm limiting myself not to what the guideline would say about the loss, nor am I talking about anything other than that discretion which the trial judge has based upon some effort, we don't know the extent of it, on the part of the criminal to try to make restitution. Does it make a difference? And should it make a difference? Because we have, in this case, a total exclusion of the evidence to that effect. It absolutely should not make a difference in the sentence, Your Honor. So if the defendant's actions... Go ahead. A defendant's actions after the completion of the criminal conduct, after indictment, and after he's been caught are simply not material to punishment. Obviously, the guidelines incorporate that, and certainly the court's reasonableness review would account for that. The court was presented with that issue, and he had an opportunity to consider that at the first sentencing, and clearly did in the second sentencing, and he wasn't troubled by that fact. I mean, we simply cannot create a rule wherein a defendant, long after he's caught, is able to escape culpability and liability under the criminal law for repaying the victim. If that were the case, then every one of these fraud cases would involve reparations after the fact that would have to be introduced at sentencing and would reduce the defendant's liability under the criminal law, and we don't feel that that's an appropriate rule. If there were extraordinary efforts made while the criminal conduct was ongoing and prior to the time it was detected and prosecuted, well, then I think you're very correct, Your Honor. But after that time, as occurred in this case, I think it very clearly is not something that's relevant to sentencing whatsoever. It may be relevant to restitution. All right. I've taken your time. And I see my time is up, and thank you very much. Thank you, Mr. Thompson. Mr. Stevens. I feel like I'm walking through a minefield here. First of all, I want to address your attention to the appendix reference in the government's brief. That material was prepared in a series of alternative calculations, and it was utilized in the cross-examination of the contracting officer to show that if there really was a stockpile payment or we were expected to stockpile asphalt, it would have to be heated, and after three years, the cost of stockpiling would exceed the entire amount of the contract. And the BIA contracting officer conceded that, yeah, you don't do asphalt stockpiling. Now, most disturbing is that when this remand was returned, it was returned for resentencing. It was returned for resentencing de Novo, because that's what Ameline and Booker says. The judge has to go through a fact-finding process, part 6 and part 5. If you don't go through the fact-finding process, then the effort, the remand in itself is a nullity. It's meaningless. It has no import. Yeah, okay. Mr. Stevens, your time is up. It is. Let me just focus one crack at just 25 words or less. Assuming a complete fresh slate at the second resentencing, what fact did the district court not consider that Ushe made it an unreasonable sentence? A, it considered no evidence at all on proof of loss from the government or the defendant. It had a trial record. I'm sorry? It had a trial record. He had a trial record of a payment. Okay, so it's not correct that he didn't consider any proof of loss. Okay. Okay. If I understand the rule, you have to establish under Ameline, Booker, Fan-Fan, by a preponderance of the evidence, the loss when there's an objection under Rule 32 and also in the limited Fan-Fan, Booker, remand if that's what it is. It wasn't done. Second thing, everybody knew a stockpile on asphalt was a fiction. Everybody knew that it was a seasonal situation. Everybody knew that these people came to the government before they were indicted. Just 25 words or less, the facts he didn't consider. He didn't consider any evidence of proof of loss. That's right. Number two, considered no evidence on a tender in kind of the asphalt material that everybody knew would not be stockpiled. Anything else? Yes. Considered no evidence on whether or not the enhancement was appropriate. In other words, there was no evidentiary consideration under Rule 32 standards on any of the objections of the defendant on resentencing. Anything else? No, ma'am. Okay. Any other questions? Thank you for your attention. Great. Okay. Thank you, Mr. Stevens. Counsel, we appreciate your argument. The matter just argued will be submitted. The Court will take a brief recess. I don't know what the student schedule is in the University of Washington, but if you want to hang around for a few minutes, Judge Levy and I would be happy to chat with you for a brief period of time if you want to. I will. I have a blanket. I don't feel obliged to. If you have any questions for us, Professor Walsh of the University of Washington Law School, that would be a great honor. Sure.
judges: Leavy, Rymer, Fisher